This appeal arose because the U.S. District Court resolved a series of questions reserved for the trier defendant. The record below includes MRI results showing that Mr. Egberto has degenerative disease and foramenal stenosis, medical reports from an orthopedic specialist confirming that Mr. Egberto's leg spasms are real, and that the same specialist, as recently as four months before the defendant's move for summary judgment, was able to compress Mr. Egberto's test tutors without response. The magistrate judge recommended against summary judgment because, on the record, a reasonable trier of fact could conclude that these defendants delayed, denied, and interfered with treatment. Now, it's all a little... I read this case with interest, and what it looks like to me is you've got Dr. Long before February 24th, 2010. You've got Dr. Long after that, and there was also a back specialist orthopedic surgeon who was involved, in which to me, like at one point, both those physicians suggested that the pain was real, that there was, in fact, a significant medical problem. They recommended, certainly MRIs, they recommended a walker, they recommended possible surgery to specify that I'm going to have that, but at that point, it was serious. After that point, they seemed to have changed their minds and focused more on the concept that he was malingering, that he had been seen many times doing things that would have been impossible because of pain, if he were really experiencing what he alleged. In the context of an Eighth Amendment violation, what are we to do with this? I mean, people disagree, and we know that it's not enough. You've got these same people disagreeing with themselves at different times, so how do we work with that? Your Honor, how to resolve the conflict between what Dr. Long said before and after is a pressure fact that leaves you with a trigger fact, and the magistrate recommending against every judge actually noted that conflict and how it needed to be resolved. But I would add that if you look at the record, Dr. Long's recommendations for treatment changed in the months prior to the defendant's moving through circuit judgment, but the test results didn't. The MRI of the lumbar spine, the CT of the lumbar spine, and the subsequent MRI of the lumbar spine were remarkably consistent. They found disc bulges, foramenal stenosis, and nerve rooting damage, and at one point, actually, they also discovered what appeared to be a cyst. The only thing that changed near the end was Dr. Long's recommendations, but right up until the end of February 2010, as can be found in the Pelvey's excerpt to the record of Dr. 2042, at age 15, Dr. Long was still finding the same symptoms. He was still depressing his right parietal testicles to no response. He was still noting them, seeing them, and the only thing that changed was the recommendation, and how to reconcile that conflict is a question of fact. I would add, Your Honor, in this case, when the district court judge resolved these questions, determined that Mr. Imperative did not have these conditions, and he did not need the treatment prescribed, the court made three fundamental errors, any one of which, independently and by itself, is a sufficient ground to make a disorder and remand for further proceedings, and those three errors were, number one, accepting the Pelvey's excuse for confiscating Mr. Imperative's locker, namely security. Even though the MDOC had issued that locker months before, a warden had authorized it, and Mr. Imperative had used it without incident, which is documented in the record in 2ER 215-220. Are you suggesting that the locker could have been used as a weapon? Absolutely not, Your Honor. Did not Sgt. L. Caldwell v. Bannister, and before that, in Hamilton v. Adele, that the burden on prison officials is simply to provide a medically acceptable level of care. As Mr. Imperative pointed out in his opposition to the motion, he's not looking to dictate the terms, only that he have access to treatment of some kind. In this case, a doctor, Dr. Denby, prescribed the locker. Mr. Imperative received it and used it, and prison officials confiscated it as soon as he hit the ground in ESP. Is there anything in the record that indicates that other prisoners, about the same time and the same facility, were using lockers? There is an affidavit from Mr. Imperative that invades NSP, Nevada State Prison, which is another NKOC facility, had lockers, and I would add that this was a subject of litigation before this court. So we do know of that. And, Your Honor, do we have responsibility for determining that Bill Walker is a weapon and Bill Walker should be used in the prison? That's a 40-level position, Your Honor. Bill, are these incidents explainable because Warden is making different decisions on whether walkers are such a possible problem that we have no walkers or canes in the prison? Well, Your Honor, the issue here is that Warden McDaniel appears to have made this decision based on a combination of what he called security and medical concerns, and we know that actually from Dr. Cohen's report, which although Mr. Imperative's intent should not have been considered, clearly does show, and documents go forward to page 15, that Dr. Cohen approached Warden McDaniel, albeit several years later, to re-discuss the issue of the blocker, and he denied it, apparently, both on the issue of security and his own medical judgment. And that's where we run afoul of the Caldwell. Prison officials are prohibited from substituting their own medical judgment when it contradicts that of a medical profession, and that's what happened here. Dr. Gedney ordered a blocker. It was compensated, and although this case might be different, if a substitute therapy was provided, it was provided with effectively nothing. And that's what takes this to the level that a reasonable prior fact could find. It was medically unacceptable local judgment. There's some letters that went in from a defendant's wife, is that correct? That's correct, Your Honor. I need to get around the hearsay objection to that evidence. My view is, Your Honor, that it would be a waiver issue, that it was not objected to before, and in fact, in the docket, we'll look, we have affidavits from Ms. Imperative swearing to the fact that those letters were sent to you. Well, what is her, what does it show? Does she have any first-hand knowledge of it than what her husband is doing? It shows a couple things, Your Honor. First of all, it does set forth instances when she doesn't have first-hand knowledge. She visited the prison, and she reported in the letter, unfortunately, that guards had manipulated her husband to cripple him and hop him off. What it also shows, and what's salient to personal participation here, is that the letter was addressed to Director of Prisons Gordon, to Gordon McDaniel, to Dr. Tomiko, and several other people. Your Honor, I think you put your finger on it when you asked the question about how do we deal with the before and after evidence from February 10th under the context of the Eighth Amendment. The Eighth Amendment, deliberate indifference provision, as you know, has two parts. It has the objective and subjective, and under the Stonewall and Farmer and many other cases, we know that state of mind is a very important factor. The fact that my client had gone to great lengths to try to discern the injury and the complaints that Mr. Rivera was suffering from or complaining about actually is very much positive in favor of our case, because it shows that the medical department was not ignoring him. They were not pushing him aside. They were trying very hard to determine both the source of the complaints that he had and an appropriate response. And likewise, they had many visits with an independent orthopedic doctor, Dr. Wong. Counsel, let's say that we agree with Will. The reality is this is not a case where they simply didn't talk to him and didn't deal with him. You have different ways they've dealt with him, once they did talk to him and they did examine him. But I'm still concerned if you have, say, Dr. Wong, who seems to be the primary actor here, pretty certain, I think it was pre-February 2010, if I recall correctly, seemed pretty clear that the felon in this case did have some serious problems. And I changed his mind. He seemed to think he was more of a malingering, but is that a material issue of fact in the sense that if he has a serious medical condition versus one of the problems that have to be satisfied, doesn't that issue, as the district court found that it probably wasn't, doesn't that have to go back to a jury for the jury to determine how they balance what Dr. Wong said pre-February 2010 and what he and the orthopedic specialist said after that point? My response to Bruce Schroeder, first of all, Dr. Wong made his findings prior to February of 2010 largely based on the subjective complaints voiced to him by Mr. Schroeder. With respect, he printed MRIs, he physically examined him as a closing counsel, indicated he compressed his testicle, had a good right one resulting in that result, and anyway, at least from my reading of the record, it wasn't just taking his subjective views. We know that's not enough, but he did examine him. Sure enough, and as my esteemed colleague pointed out, there was objective evidence to show that there were some negative changes going on with Mr. Schroeder's spine, but I would invite the court's attention, for example, to page 192 of the record, following an incident where Mr. Imperdo had overdosed on Pruno, he was sent to William Ryeryan Hospital, and the doctor noted that all degenerative end-plate changes, plainly normal for aging, at no level is there a focal disc herniation, stenosis, or a burn or a frontal impingement, the point being... But he had two different medical opinions. Well, yeah, but we also have Dr. Long, who is willing, prior to February of 2010, to take these changes in the spine that have been noted objectively, together with the complaints of Mr. Imperdo, and you'll recall that at one point, he was unable to provide an appropriate body himself, as you will, because he was sweating and twisting so much, claiming about having hypersensitivity, so Dr. Long was in part looking at these spinal x-rays and MRIs, but he was taking Mr. Imperdo at his word, when after 2010, he and Dr. Cohen, his father, it's not just Dr. Long, it's also Dr. Cohen, had a consultation by phone and discussed the case further. They were convinced that there was poindering and exaggeration occurring, that's why they took him off the oxycodone, and they withdrew the effort for decaying in a lumbar canal. When you ask the question, should this go to a jury, not if there isn't any contrary evidence in the record to suggest anything beyond a possibility. But there's no possibility here, these are objective findings, they don't go away, it's not like a cold that goes away, and so if there is some evidence in there, that there's objective findings, that the lawyers agree, the doctors agree at one time, they can draw all sorts of inferences, for example, that Dr. Long is just, this is not a likable man, but we don't put likable people ordinarily in prison, the constitution still goes with them, and some of these individuals, I'm sure they don't care very much for, the jury could have decided that they were doing, for example, when he was to get an MRI, all of a sudden, they shipped him off to another facility, saying he has a court date, there was no court date, he didn't even get hurt a month later, and yet it was the very day that he was supposed to get an MRI, I'm sure they could decide that these people are really punishing this individual because they don't like it, it's a factual opportunity, now they may decide completely your way, but I'm having trouble as my colleague Judge Smith was, of whether the tissue judge jumped a little too early on this one, I understand the court's concern and I appreciate it, and when I was evaluating this case for this discussion this morning, I sort of felt that that's where this case was going to go, I can't deny the fact that there are objective, there is objective evidence that establishes that there were changes in Mr. Aguero's back, but they don't explain, and there is no contrary evidence after February of 2010, that establishes and supports the level of claimant cookies that he had, as Judge Smith pointed out, the evidence indicated that when he was, didn't think he'd be being watched, he performed all kinds of activities, and so at some point it ceases becoming a question of fact or the jury, when all of the evidence after February of 2010 leads to the conclusion that the complaints are not justified by anything that medical science could find going on in his body. Well that's one way to look at it, but as you know, being the good lawyer that you are, it also is something that the jury, if it got to the jury, would say, you know, this guy was really a malinger, they may decide exactly what the state wants, but you agree, I think, that Dr. O'Loughlin was so strong on this prior to February of 2010, that the fact that he changed his mind later is the very kind of thing that will usually have the jury, if that's the finder of fact, determine. Isn't that correct? It is correct that certainly this court could order a re-trial and it goes back to the jury, but I don't think any jury will be instructed to speculate on the evidence after February 10th, and if the record is devoid of any evidence that supports the complaints that Mr. Roberto was complaining about, then it is not a jury question, and it was correctly decided by the judge, other than the fact that the evidence is overwhelmingly supportive of the fact that there were no objective explanations for the level of complaints that Mr. Roberto was experiencing, then it should not go to the jury, and my colleague mentioned Caldwell v. Baxter, I was the counsel for that case, and it never brought us to that conclusion. And then very briefly, Judge Wallace, you had mentioned about the cane and the walker, those are very limited, except for people who are basically paralyzed, they should keep at a domestic security prison, such as Healy, or you would send to Northern Nevada Correctional Center, that's where the regional medical facility is located, and they do have inmates that have walkers and canes there, but yes, they can both be used as weapons, and they can both be used to find contraband, which we know that Mr. Roberto had violated those on a number of occasions. If there are no further questions, we'll see what we can do. I want to try to push, you know, with your 25 seconds left, a jury could actually believe this man is possible. If that's so, then they're going to believe that he really did have pain afterwards. Now, assuming that the doctors are going to continue with their testimony, or they're going to continue on the part of the trial, that the man is only a murderer, that would be a question assigned to the jury. So, Ethan, if you're right on all the issues, it's all your evidence versus a person saying, no, no, I've got a pain. And what it seems to me that the court did, and you have to live with it, it seems to me that the court was making a decision that they will never believe this man because of APNC. But that's something that grew close on our finding on that issue of factors under contention. When it gets that close on a constitutional issue, what is our role? What is our role in making that decision? We have to come to the conclusion that he was a murderer. Rather than saying the jury may find that he was a malingerer, I would say that when all of the evidence establishes that he was malingering or exaggerating, that no jury can find that there was anything other than an individual who was exaggerating his claims to obtain narcotic drugs. That is guilty evidence, though, isn't it? Well, it is after February the 10th. So if the case were remanded and it were to go back before the jury, the only evidence that Mr. Ricardo could present to support his claim after February the 10th would be his subjective complaints. Now, if this court is going to rule that that alone, in the face of overwhelming contrary evidence, supports a remand, then that's how the court is going to rule. But I believe under Iqbal and under Twombly, when you have a mere possibility, let alone nothing that supports probability, the better rule is to support the district court when an issue is ruling. And let's remember, please, that this was something that was arrived at long after many other medical records and testimony had come in. And I don't think that it is appropriate under the Eighth Amendment to allow a case to go before a jury when there is clear evidence that has not been contradicted in the record that shows that there was exaggerations rather than true objectives and problems that explain the need and the scope of the case. I think we have your argument. Thank you very much. You have a little bit of time left for rebuttal. Thank you, Your Honor. A few final points. To take us back to the standard at the summary judgment stage where Mr. Ricardo found himself, the burden on him was only to show some evidence to support his claim. In fact, the evidence overwhelmingly supported him. And the document the court looked at a moment ago is a prime example. 2ER192 is an MRI of the thoracic spine in the midsection of the back. That's not what's at issue in this case. What's at issue is Mr. Ricardo's lumbar spine. It's the equivalent to a doctor making a decision about a patient's right leg by doing a scan of the right leg. And if we look into proper scans of the MRIs, we flip back to 2ER191, we see that these are, again, consistent with all the other scans of Mr. Ricardo's lumbar spine and, in fact, overwhelmingly support his claim. Now, to go back to Dr. Long's February 2010 statement, again, if there is a conflict here, it is a question of fact for the jury. But it's important to remember that Dr. Long's assessment of Mr. Ricardo really did not change in the fundamentals. He was still able to get the same results with the impression. He was still finding a link and he was still finding a pain. And I would add that a mere months earlier, in September 2009, Dr. Long recommended a walker, which brings us to the final important point here to remember. The district court made decisions that affected four forms of treatment. The walker, the MRI appointment, the proper medications, the spinal injections, and surgery. He made one of these independently by himself. He sufficiently chose to make a disorder. And the conflict with Dr. Long really touches one of the other three remaining fact questions that needed to go to a jury. Thank you very much. We appreciate it. The case just argued is submitted.
judges: Wallace, Clifton, M. Smith